**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONOVAN "PUFF" JOHNSON, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MOTION FOR TEMPORARY** |
| | ) | **RESTRAINING ORDER AND** |
| NATIONAL COLLEGIATE ATHLETIC | ) | **PRELIMINARY INJUNCTION** |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Now comes Plaintiff Donovan "Puff" Johnson, by and through the undersigned counsel and

pursuant to Fed. R. Civ. P. 65, respectfully requests this Court issue a Temporary Restraining Order

and Preliminary Injunction against Defendant National Collegiate Athletic Association, enjoining

it from enforcing NCAA Bylaw 12.8.4 (b) & (c) against him and permitting him to compete during

the 2025-2026 college basketball season. This Motion is filed contemporaneously with his Verified

Complaint. A Memorandum in Support of this Motion follows.

Respectfully submitted,

/s/ *Larry H. James*
LARRY H. JAMES (0021773) *Trial Attorney
CHRISTOPHER R. GREEN (0096845)
MARISSA R. BORSCHKE (0100369)
Amundsen Davis LLC
500 S. Front Street, Suite 1200
Columbus, Ohio 43215
Telephone: (380) 205-6211
Email: ljames@amundsendavislaw.com
       cgreen@amundsendavislaw.com
       mborschke@amundsendavislaw.com
*Counsel for Plaintiff, Donovan "Puff" Johnson*

1

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. 2

SUMMARY OF ARGUMENT ....................................................................................................... 3

MEMORANDUM IN SUPPORT ................................................................................................... 6

   I.     INTRODUCTION ............................................................................................................... 6

   II.    BACKGROUND FACTS. .................................................................................................. 8

      A.   The offending NCAA Bylaws. ................................................................................... 8

      B.   Donovan "Puff" Johnson ........................................................................................... 9

   III.   LAW AND ARGUMENT. ............................................................................................... 12

      A.   Johnson is likely to succeed on the merits of his claims. .......................................... 12

      B.   Irreparable harm to Johnson ..................................................................................... 26

      C.   Balance of Equities. ................................................................................................. 27

      D.   Public Interest. ......................................................................................................... 29

      E.   No bond necessary .................................................................................................... 29

   IV.    RULE OF RESTITUTION. ............................................................................................. 30

   V.     CONCLUSION. .............................................................................................................. 32

CERTIFICATE OF SERVICE ..................................................................................................... 33

## SUMMARY OF ARGUMENT

Plaintiff Donovan "Puff" Johnson seeks a Temporary Restraining Order and Preliminary Injunction to restore his eligibility for the 2025–2026 men's basketball season at The Ohio State University. Johnson challenges the NCAA's denial of his Medical Hardship Waiver under Bylaw 12.8.4(b) and (c)—a rule that now functions not merely as an eligibility limitation, but as a gatekeeping mechanism for economic participation in the modern collegiate sports marketplace. Indeed, Johnson's ability to receive NIL compensation from Ohio State is tied directly to his eligibility. (Compl. ¶¶ 45–46, 57–59; Wilson Dec. at ¶ 7; Diebler Dec. at ¶ 5).

Johnson's eligibility is governed by NCAA Bylaw 12.8.4(b) and (c) (referred to herein as the "Hardship Restriction"), which sets rigid thresholds for medical hardship waivers, including participation in no more than 30% of games and no competitions in the second half of a season (Compl. ¶¶ 33–34). During the 2024-2025 season, Johnson suffered multiple injuries, including misdiagnosed wrist and hand injuries, that cumulatively caused him to exceed the 30% threshold by only a small margin and participate minimally in the second half of the 2024-2025 season (Compl. ¶¶ 40–42, 48–52). Despite this, the NCAA denied his Medical Hardship Waiver, ignoring established precedent for similar cases (Compl. ¶¶ 54–57).

Since the Supreme Court's decision in *National Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021), and the rapid evolution of Name, Image, and Likeness ("NIL") opportunities, the collegiate athletics landscape has fundamentally changed. NCAA eligibility is now directly tied to economic opportunity: the ability to earn NIL income, secure sponsorships, and pursue professional advancement. The Hardship Restriction is commercial in nature, impacts NIL compensation, and constitutes an arbitrary restraint on trade. Courts have recognized that eligibility rules affecting economic opportunities are subject to antitrust scrutiny (*Zeigler v. NCAA*,

3

Case No. 3:25-cv-226-KAC-JEM (E.D. Tenn. June 12, 2025; *Alston*). The NCAA's purported procompetitive justifications fail, and less restrictive alternatives are available (Compl. ¶¶ 78-90).

The NCAA's bylaws form a contractual framework with member institutions and athletes (NCAA Bylaw 20.1.1). By denying Johnson relief while ignoring precedent, the NCAA breached its contractual and good faith obligations (*Oliver v. NCAA*, 920 N.E.2d 203 (Ohio Ct. Comm. Pl. Feb. 12, 2009)). Moreover, Johnson's NIL contract with Ohio State, contingent upon eligibility, was disrupted by the NCAA's denial. The NCAA acted with knowledge, intentionally, and without justification, causing irreparable economic harm (Compl. ¶¶ 57–59). Finally, the Hardship Restriction is applied mechanistically, without regard to Johnson's actual injuries or playing time, demonstrating arbitrary and capricious enforcement of NCAA rules (Compl. ¶¶ 33–34, 40–42).

Denial of eligibility causes immediate and non-compensable harm to Johnson's collegiate career, NIL opportunities, and professional prospects. Courts recognize that lost athletic participation and associated economic and reputational opportunities are inherently irreparable (*Biediger*, 616 F. Supp. 2d at 291; *Pavia*, 2024 U.S. Dist. LEXIS 228736, at \*22-23). The harm to Johnson is substantial, permanent, and cannot be remedied post-season, while the NCAA suffers no cognizable harm from temporary restoration of eligibility. Temporary restoration of eligibility benefits both Johnson and the broader public interest (Compl. ¶¶ 24, 92-95).

Finally, to ensure meaningful relief, the Court should enjoin the NCAA from enforcing Bylaw 12.11.4.2 ("Rule of Restitution"), which authorizes retroactive penalties against institutions and athletes who comply with court orders. Courts have repeatedly recognized that enforcement of this rule would nullify injunctive relief and chill assertion of legal rights (*Williams v. NCAA*, 24-cv-614; *Pavia v. NCAA*, 3:34-cv-01336; *Moore v. NCAA*, DC-25-1315).

4

For the reasons above, Johnson respectfully requests that the Court issue a temporary restraining order and preliminary injunction restoring his eligibility for the 2025–2026 season, enjoining enforcement of the Hardship Restriction and the Rule of Restitution.

## MEMORANDUM IN SUPPORT

### I. INTRODUCTION.

Plaintiff Donovan "Puff" Johnson respectfully acknowledges that the relief sought herein—a Temporary Restraining Order and Preliminary Injunction—is extraordinary. Yet this extraordinary relief is warranted and justified under the circumstances. The 2025–2026 Ohio State University men's basketball season began just two nights ago—November 3, 2025. Without immediate judicial intervention, Johnson will lose his roster spot and forfeit his final season of his collegiate career. (Diebler Dec. ¶ 3) He would become ineligible to receive an athletic scholarship, miss an opportunity to establish himself as an NBA draft prospect, and lose a significant Name, Image, and Likeness ("NIL") contract that is contingent upon his eligibility to play. (*Id.* ¶ 4-5). These harms are immediate, substantial, and irreparable.

And courts are recognizing the severity of such harms. In recent months, courts across the country have repeatedly acknowledged that NCAA eligibility restrictions—especially those that operate as rigid, arbitrary caps on participation—inflict anticompetitive harm and irreparable injury on student-athletes. In *Pavia v. NCAA*, the court granted Vanderbilt University quarterback Diego Pavia's motion for a preliminary injunction, enjoining the NCAA from applying its "Intercollegiate Competition Rule" (Bylaw 12.8) to count his junior college season as a year of competition. 2024 U.S. Dist. LEXIS 228736, at *22-23. The court emphasized that such an interpretation would have clear anticompetitive effects on junior colleges and college athletes alike by reducing mobility and artificially restricting market participation.

Following *Pavia*, courts nationwide have issued similar injunctions protecting athletes' right to compete. In *Elad v. NCAA*, Case No. 3:25-cv-011981 (D.N.J. Apr. 25, 2025), the court enjoined the NCAA from enforcing its "Five-Year Rule" and ordered the immediate grant of a

6

waiver allowing Elad to compete in the 2025–2026 season. In *Bustard v. NCAA*, Case No. 25-000779-CP (Mich. 22nd Cir. Ct. May 29, 2025), the court likewise prohibited enforcement of the Five-Year Rule and found a likelihood of success under the Michigan Antitrust Reform Act.

Federal courts have also acted to protect athletes in analogous circumstances. *In Braham v. NCAA*, Case No. 3:25-cv-00253 (D. Nev. July 18, 2025), the court granted a preliminary injunction blocking enforcement of NCAA eligibility rules on antitrust grounds. Shortly thereafter, in *Martinson v. NCAA*, Case No. 25-cv-01376 (D. Nev. July 30, 2025), the court issued both a TRO and a preliminary injunction, expressly finding that the NCAA's Five-Year Rule was anticompetitive and violated federal antitrust law.

State courts have followed the same reasoning. In *Moore v. NCAA*, Case No. DC-25-1315 (Dallas Cty. Dist. Ct. Tex. Aug. 12, 2025), the court enjoined enforcement of the NCAA's eligibility rules and its "Rule of Restitution," finding that the plaintiff would suffer irreparable harm and had a strong likelihood of success on the merits. Similarly, in *Robinson v. NCAA*, Case No. 25-cv-00075 (N.D. W. Va. Aug. 19, 2025), the court ordered that the plaintiffs be allowed to compete in the 2025–2026 season after finding a strong likelihood of success on their antitrust claims. Most recently, in *Grant-Foster v. NCAA*, Case No. 2520506032 (Spokane Cty. Sup. Ct. Oct. 14, 2025), the court granted a preliminary injunction allowing the Tyon Grant-Foster to participate in the 2025–2026 collegiate basketball season for Gonzaga University.

Together, these cases reflect a clear judicial trend: <u>courts are no longer deferring to the NCAA's rigid and anticompetitive eligibility rules when they operate to exclude qualified student-athletes from competition without legitimate justification</u>. Like those plaintiffs, Johnson faces immediate exclusion, severe economic harm, and the permanent loss of unique, time-sensitive opportunities. This Court's intervention is necessary to preserve the status quo, prevent irreparable

7

harm, and ensure that Johnson is permitted to compete while the legality of the NCAA's actions is adjudicated on the merits.

## II. BACKGROUND FACTS.

### A. The offending NCAA Bylaws.

The National Collegiate Athletic Association ("NCAA") is a membership organization composed of more than 1,000 colleges and universities that collectively regulate intercollegiate athletics and determine the eligibility of student-athletes nationwide. (Compl. ¶ 26). Through its extensive network of bylaws, the NCAA exercises plenary control over virtually every aspect of athlete eligibility and participation (Compl. ¶ 33).

At the center of this dispute is NCAA Bylaw 12.8.4 (b) & (c). This rule governs eligibility for a Medical Hardship Waiver, which allows an athlete to receive an additional year of competition if a season is lost to injury or illness. (*Id.* at ¶ 34). However, the rule strictly prohibits granting such a waiver if the athlete has participated in more than 30% of the team's scheduled or completed contests or in more than three contests, whichever is greater, and the injury or illness occurred prior to the first competition of the second half of the playing season (hereinafter referred to as the "Hardship Restriction") (*Id.*).

Under Bylaw 12.8.4, a student-athlete may receive an additional year of competition only if three conditions are met:

(a) The incapacitating injury or illness occurs during one of the athlete's four seasons of intercollegiate competition;

(b) The injury occurs prior to the first competition of the second half of the season and renders the athlete unable to compete for the remainder of that season; and

(c) In team sports, the athlete has not participated in more than 30% of the team's contests or three competitions, whichever is greater.

8

(Compl. ¶ 35).

In practice, the NCAA's bright-line 30% threshold and second-half-of-season prohibition often leads to arbitrary outcomes—disqualifying athletes who sustained legitimate, season-ending injuries in the second part of the season and whose participation marginally exceeded the limit. The bylaw's rigid application, rather than advancing fairness or athlete welfare, frequently undermines the very purposes of the hardship-waiver process.

**B. Donovan "Puff" Johnson.**

Donovan "Puff" Johnson exemplifies the type of student-athlete the NCAA's hardship rules are intended to protect—an academically committed and talented player whose career has been repeatedly derailed by injuries and medical hardships beyond his control (Compl. ¶ 36). Johnson, a 6-foot-8-inch small forward from Moon Township, Pennsylvania, was a highly recruited four-star prospect who earned a full athletic scholarship to play Division I basketball at the University of North Carolina at Chapel Hill ("North Carolina") (Compl. ¶ 37). During his freshman season (2020–2021), he suffered a broken foot, limiting him to fewer than 60 minutes of total game action. North Carolina did not apply for a medical hardship waiver on his behalf (Compl. ¶ 38).

<u>After missing more than a year of play</u>, Johnson returned midway through his sophomore season (2021–2022) and became a key contributor to North Carolina's run to the 2022 NCAA National Championship Game, scoring 11 points in the title contest (Compl. ¶ 39). His junior season (2022–2023) was again disrupted by injury, as he missed significant time due to patellar inflammation and recurring pain (Compl. ¶ 40).

In 2023, Johnson transferred to Pennsylvania State University ("Penn State") to continue his academic and athletic career. Before the start of the 2023–2024 season, he tore his patellar

9

tendon, missing the entire preseason and the first two games, and later reinjured the same knee (Compl. ¶ 41). His misfortune continued into the 2024–2025 season, when he sustained multiple injuries—including a heel stress fracture, wrist injury, concussion, and broken hand requiring surgery—which ultimately ended his season (Compl. ¶ 42).

At the time of the final injury, Johnson had appeared in 17 of Penn State's 31 games, or roughly 55% of contests, though he participated in only 34% of total available minutes (Compl. ¶ 43). Indeed, the injury occurred four (4) minutes into the 17th game. Despite this limited involvement and repeated incapacitating injuries, the NCAA deemed him ineligible for hardship relief.

Beyond his physical injuries, Johnson has also been diagnosed with Crohn's disease and has faced family and mental health challenges, all of which he has managed while maintaining academic standing and compliance with team obligations (Compl. ¶ 44-45). Seeking a final opportunity for a healthy season, Johnson enrolled at The Ohio State University in July 2025 and, together with Ohio State, applied for a Medical Hardship Waiver to restore his eligibility for the 2025–2026 season (Compl. ¶ 46; Compl. Ex. 1). On September 30, 2025, the NCAA denied the waiver, citing the 30% participation limit and concluding that Johnson's 2024–2025 appearances exceeded the threshold by seven contests (Compl. ¶ 47; Compl. Ex. 2). The NCAA also noted that he had appeared in two games during the second half of that season. (Compl. at Ex. 2).

Johnson and Ohio State timely appealed the denial, providing medical evidence that his December 10, 2024 wrist injury had been misdiagnosed and that continued play led to his season-ending hand fracture (Compl. ¶¶ 48-52; Compl. Ex. 3). Orthopedic specialist Dr. Glen Buterbaugh confirmed that, had the injury been properly diagnosed, Johnson's season would have ended

immediately in December 2024 (Compl. ¶ 49). The appeal also noted that Penn State's treatment failures directly contributed to the subsequent injury (Compl. ¶¶ 49–53).

During Johnson's active participation, Penn State's record was 13–4, but after his injury, the team finished 3–11, missing postseason play (Compl. ¶ 54). These facts underscore that Johnson's injuries materially affected both his own and his team's performance, further demonstrating the inequity of counting his partial season against the 30% threshold (Compl. ¶ 55). Johnson also presented evidence of NCAA precedent granting waivers in nearly identical circumstances, such as the Petition of Ryan Cornish (Case No. 1240764), where the NCAA granted a hardship waiver to an athlete who exceeded the 30% threshold after a misdiagnosed injury (Compl. ¶ 56). Nevertheless, the NCAA has not yet issued a final decision on Johnson's appeal (Compl. ¶ 57).

Johnson is currently enrolled at Ohio State. He has been offered a roster spot on The Ohio State Men's Basketball team for the 2025-2026 season and an athletic scholarship that is contingent upon his eligibility to compete. (Compl. ¶ 58; Deibler Dec. at ¶ 3-4). If he remains ineligible, Johnson and his family will be forced to pay full tuition, fees, and living expenses or withdraw from school entirely (Compl. ¶ 58). If declared eligible, Johnson will receive compensation for his NIL from Ohio State for the 2025-2026 season. (Diebler Dec. at ¶ 5; Wilson Dec. at ¶ 7). In addition, additional endorsement and sponsorship opportunities that depend on his participation at Ohio State will be lost. (Wilson Dec. at ¶ 11). The financial and professional impact of such a decision is severe. (Compl. ¶ 59).

Ohio State's season began on November 3, 2025. (*Id.* ¶ 60). Unless Johnson's eligibility is restored immediately, he will be irreparably harmed by losing games, practices, and exposure opportunities that can never be recovered. Each missed contest diminishes his professional

11

prospects and causes substantial, non-compensable harm, warranting expedited judicial relief (Compl. ¶ 59; Wilson Dec. ¶¶ 10-13).

## III. LAW AND ARGUMENT.

### A. Johnson is likely to succeed on the merits of his claims.

The issuance of preliminary injunctions and temporary restraining orders are both governed by Rule 65 of the Federal Rules of Civil Procedure. Courts may issue preliminary injunctions "only on *notice* to the adverse party." Fed. R. Civ. P. 65(a)(1) (emphasis added). "This notice requirement implies 'a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition.'" *Amelkin v. McClure*, 74 F.3d 1240, 1996 WL 8112, at *5 (6th Cir. Jan. 9, 1996) (citation omitted).

In contrast, courts are permitted to issue temporary restraining orders without written or oral notice to the adverse party (also known as an *ex parte* temporary restraining order) when two requirements are met. First, there must be "specific facts in an affidavit or a verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and second, "the movant's attorney [must] certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(A)-(B). Temporary restraining orders are emergency measures meant "to prevent immediate and irreparable harm to the complaining party during the period necessary to conduct a hearing on a preliminary injunction." *NetChoice, LLC v. Yost*, 711 F. Supp. 3d 844, 852 (S.D. Ohio 2024) (Marbley, J.).

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (citation omitted). A plaintiff seeking a preliminary injunction must meet an exacting standard. The Court considers "(1) whether the

movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *See Union Home Mortg. Corp. v. Cromer,* 31 F.4th 356, 365-66 (6th Cir. 2022) (quotation omitted) (en banc) (per curiam). "While no single factor necessarily is dispositive, the first—the likelihood of success—in many instances will be the determinative factor." *Dahl v. Bd. of Tr.,* 15 F.4th 728, 730 (6th Cir. 2021) (citations omitted). A plaintiff is "not required to prove his case in full" at the preliminary injunction stage. *See Certified Restoration Dry Cleaning Network, LLC, v. Tenke Corp.,* 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981)).

### 1.  Sherman Act (and Ohio Valentine Act).

The Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations," is illegal. 15 U.S.C. § 1. Despite the text of the Act, the Supreme Court has long held that the Act prohibits only "unreasonable" restraints on trade. *See Standard Oil Co. v. United States,* 221 U.S. 1, 51 (1911); *see also United States v. Columbia Steel Co.,* 334 U.S. 495, 522 n. 19 (1948) (citation omitted). To fall within the ambit of the Act, a challenged rule must be "commercial in nature." *See Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 432 (2008) (citing *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n,* 388 F.3d 955, 958 (6th Cir. 2004)). The United States Court of Appeals for the Sixth Circuit has described the requirement broadly. "There must be a commercial activity implicated." *Id.* at 433. The Court considers "whether the rule itself is commercial, not whether the entity promulgating the rule is commercial." *See id.* (quoting *Worldwide Basketball,* 388 F.3d at 959).

13

Recently, in *Zeigler v. NCAA*, the Eastern District of Tennessee considered whether the NCAA's "Four-Seasons Rule" is "commercial" under the Sherman Act. *See Zeigler v. NCAA*, Case No. 3:25-cv-226-KAC-JEM (E.D. Tenn. June 12, 2025). Zeigler argued that the Four-Seasons Rule violated the (1) Sherman Act, 15 U.S.C. § 1; and (2) Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 (TTPA). Under Plaintiff's theory, NCAA's Four-Seasons Rule prevents him from playing a fifth year of Division I basketball, and without a spot on a Division I roster, he loses significant NIL compensation. He and those like him are replaced by less "experienced" and lower paid players. Thus, the Four-Seasons Rule is an unlawful restraint on trade.

Although the court concluded that *Zeigler* had not demonstrated substantial anticompetitive effects in the relevant market—the NIL market—and that the NCAA "currently does not control the NIL compensation that NCAA Division I basketball players receive," and denied Zeigler's request for injunctive relief, it nevertheless held that the Four-Seasons Rule is commercial in nature. The court reasoned that, in the post-*Alston* era, participation in Division I basketball directly impacts a player's NIL earning opportunities. Accordingly, the Sherman Act applies to the NCAA's enforcement of the Four-Seasons Rule. Additionally, in a footnote, the court took judicial notice of the approval of the *House* settlement but observed that Zeigler's preliminary injunction motion was not based on the anticipated economic changes that may result if NCAA member institutions implement that settlement.

### i.     The Hardship Restriction is Commercial.

At this stage, there should be no real dispute that the Hardship Restriction is "commercial" under the Sherman Act. Like the Four-Seasons Rule in *Zeigler*, the Hardship Restriction implicates "commercial activity," *see Bassett*, 528 F.3d at 433, and has "some commercial impact," *see Worldwide Basketball*, 388 F.3d at 959. Like the Four-Seasons Rule, the Hardship Restriction

14

places limits on participation in Division I basketball, at least implicates commercial activity, and has some commercial impact.

## ii.     Rule of Reason Applies.

Whether Johnson has a likelihood of success on his Sherman Act claim hinges on whether the NCAA unreasonably restrained trade and caused a market injury. As to the former, *Alston* indicates that courts should apply a three-step, "rule of reason" framework in analyzing anticompetitive effects. *Alston*, 594 U.S. at 87-96. At step one of this framework, a plaintiff must show that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio*, 585 U.S. at 541. If the plaintiff meets this burden, then the case proceeds to step two where "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* Finally, if the defendant shows a procompetitive rationale, then "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

### a.     Anticompetitive effects.

A plaintiff can demonstrate a substantial anticompetitive effect directly or indirectly. *Ohio*, 585 U.S. at 542. Direct evidence of anticompetitive effect is "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (alteration adopted and citation and quotation marks omitted). Indirect evidence is "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* As the Supreme Court explained, Defendant undoubtedly has market power; indeed, "[t]he NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." *Alston*, 594 U.S. at 90

15

(emphasis original). Therefore, *Alston* holds that any restraints by Defendant on student-athlete eligibility harms competition.

The NCAA establishes and enforces rules purportedly designed to ensure fairness and promote student-athlete welfare. These rules are adopted through votes by the NCAA Division I Council and member institutions, amounting in practice to horizontal agreements between the NCAA and its member schools, which are otherwise competitors in the market for student-athlete services. The Hardship Restriction produces substantial anticompetitive effects on the market for NCAA athlete services. These effects are particularly severe because the restriction systematically and arbitrarily removes valuable and productive participants from the market, after an injury, *in punitive fashion.*

The Hardship Restriction has an anticompetitive effect on the market for student-athletes by limiting who is eligible to play college basketball. The NCAA's own governing documents expressly acknowledge its discretionary authority to grant relief from its eligibility limits. *See* NCAA Bylaw 12.8.4.1.1 (2024–2025 NCAA Division I Manual) ("The committee shall have the authority to review and determine whether to approve the waiver based on circumstances that may warrant relief from the application of the legislated waiver criteria."). The competitive landscape has changed because it allows higher profile athletes like Johnson and Diego Pavia to earn a rapidly growing pie of NIL compensation. *Id.*, at \*1 ("the NCAA drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their [NIL]"). To that point, an athlete who is allowed another season could earn additional NIL compensation, which may be life changing for student-athletes.

For example, the NCAA approved a medical hardship waiver for Rori Harmon of the Texas women's basketball team for an injury suffered 12 games into the 2023-24 season. *NCAA Approves*

16

*Medical Hardship Waiver for Rori Harmon*, University of Texas Athletics (Aug. 29, 2024), https://www.texaslonghorns.com/news/2024/8/29/womens-basketball-ncaa-approves-medical-hardship-waiver-for-rori-harmon. As a result, Harmon has since been able to capitalize on significant NIL opportunities such as attending a Formula 1 event in Austin, Texas to help bring attention. Payton Blalock, "Two Texas Longhorns Take In Unique Experience at Austin Formula 1 Event," *Sports Illustrated* (Oct. 20, 2025), https://www.si.com/college/texas/basketball/two-texas-longhorns-take-in-unique-experience-at-austin-formula-1-event. Indiana men's basketball player Xavier Johnson was granted an extra year of eligibility after the NCAA approved a medical hardship waiver for him during the 2023-24 season. Jeff Borzello, *Indiana's Xavier Johnson Gets Medical Hardship Waiver from NCAA*, ESPN (Apr. 26, 2023), https://www.espn.com/mens-college-basketball/story/_/id/36297906/indiana-xavier-johnson-gets-medical-hardship-waiver-ncaa. As a result, Johnson became part of the Hoosiers For Good – Indiana's NIL collective – and partnered with "A Kid Again," an organization that aims to foster hope, happiness, and healing for children with life-threatening conditions. Mike Schumann, *Official IU Collective Hoosiers for Good's Summer 2023 Class Is Largest to Date, Includes All IU Basketball Players*, The Daily Hoosier (Aug. 31, 2023), https://www.thedailyhoosier.com/official-iu-collective-hoosiers-for-goods-summer-2023-class-is-largest-to-date-includes-all-iu-basketball-players/.

Here, the Hardship Restriction imposes arbitrary limitations on student-athletes. It bars an athlete who suffers a season-ending injury from qualifying for a Medical Hardship Waiver if the athlete participates in more than three contests or dates of competition, or more than 30% of the team's scheduled or completed contests—whichever is greater. There is no evidence, rationale, or analysis demonstrating why 30% constitutes "meaningful participation" or why an athlete who competes in slightly more should be excluded from the market. The rule is compounded by the

second-half-of-season prohibition, which denies a waiver if the athlete participates in *any* competition during the latter half of the season, even for a single minute. This results in arbitrary outcomes: an athlete could miss 19 of 20 games due to injury, appear briefly in the final game, and still be entirely barred from reclaiming eligibility. Rather than advancing fairness or athlete welfare, these rules systematically and arbitrarily remove valuable and productive participants from the market.

At its core, eligibility status is a gatekeeping mechanism to compensation—the Hardship Restriction is a wage-fixing restraint. Indeed, Johnson is experiencing the anticompetitive effects first-hand. He has lost a significant wage opportunity valued in the which is conditioned upon his status as an eligible Division I men's basketball player at Ohio State. The Hardship Restriction is an arbitrary eligibility cap which limits who can receive school-linked pay.

Consumer choice is also impacted. Fans, sponsors and brands fans, sponsors, and brands are prevented from contracting with or supporting the athletes they prefer. Athletic apparel companies, endorsement partners, and local businesses lose the ability to engage high-performing athletes, and fans are deprived of the opportunity to follow or back the players they value most. (Wilson Dec. at ¶ 10). By excluding athletes based on arbitrary game-count thresholds or minimal second-half participation, the NCAA artificially suppresses competition in the market for athlete services. This is impermissible, as "[p]rice fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 110 (2021) (Kavanaugh, J., concurring).

### b. *Procompetitive justifications fail.*

There are no procompetitive justifications for the Hardship Restriction. The rule does not regulate team spending, recruiting, or game schedules. More fundamentally, it arbitrarily defines what constitutes "meaningful participation" in a season, yet it produces no measurable or meaningful benefit to competitive balance. By imposing a rigid percentage-based cutoff, the NCAA excludes athletes from competition for purely numerical reasons, rather than advancing any legitimate objective tied to parity, fairness, or the welfare of student-athletes.

Instead, it simply removes one injured athlete from competition, which does not improve competitive balance. The NCAA's only potential justification is that the restriction prevents student-athletes from playing nearly the entire season, suffering a late-season injury, and then claiming an additional year of eligibility. Even if framed as a fairness measure, this rationale is disconnected from how teams actually compete and from the economic realities of the market for athlete services.

Indeed, the NCAA's assertion that the Hardship Restriction preserves "meaningful participation" or competitive fairness is, in reality, a pretext to control which athletes may access the economic marketplace. As the Supreme Court emphasized in *Alston*, labels cannot justify anticompetitive restrictions. 594 U.S. at 110 (2021) (Kavanaugh, J., concurring). Here, the rule arbitrarily restricts labor supply and suppresses competition rather than advancing any legitimate institutional interest.

This restriction is particularly harmful in the today's landscape, where student-athlete compensation is increasingly driven by NIL deals and direct school payments. By enforcing the Hardship Restriction, the NCAA denies athletes access to financial opportunities, thereby suppressing both individual earning potential and broader market competition.

19

### c. *Less restrictive alternatives.*

As discussed in many Sherman Act cases, if there are less restrictive alternatives available, the courts should consider those. Here, the NCAA's Hardship Restriction is far broader than necessary to achieve any purported goal of competitive balance or fairness.

The NCAA could introduce a more flexible participation cap, allowing athletes to appear in a greater percentage of games—such as up to 50%—or assess eligibility based on the actual minutes played or proportion of playing time missed, rather than applying a rigid cutoff. . This preserves the equity goal while allowing fair treatment for mid-season injuries, like Johnson experienced.

Second, the restriction based on any participation in the second half of the season serves no legitimate purpose. The NCAA could instead evaluate eligibility based on actual minutes played or games missed following the injury, ensuring that minimal participation does not result in a complete denial of the Medical Hardship Waiver.

Third, the NCAA could allow for individualized review process using medical-documentation review and coaching reports to determine appropriate restriction. Injuries differ in severity, timing, and impact on the athlete's participation. A personalized review would allow eligibility determinations based on the specifics of the injury, team circumstances, medical evidence, the athlete's role on the team, and actual missed playing time. Such an alternative approach would have greatly benefited Johnson. Recall, Dr. Buterbaugh opined that Johnson's January 15, 2025 injury to his right wrist, was a direct consequence of the injury suffered to his right hand on December 10, 2024. In other words, Johnson's "injury clock" for the purposes of receiving a medical hardship waiver under the current rule, should have started on December 10

20

and Johnson would not have participated in more than 30% of Penn State's games nor would he have competed in two games following the halfway point in the season.

Fourth, the NCAA could allow temporary or partial eligibility restoration for athletes who return for limited competition, ensuring that brief or non-disruptive appearances do not automatically bar a waiver.

Finally, the NCAA could adopt a tiered or sliding-scale system that considers multiple factors, such as games played, minutes on the court, and timing of the injury, rather than rigid percentages. Such a system would achieve the NCAA's stated objectives while accommodating the individual circumstances of each athlete.

Accordingly, there are *multiple* less restrictive alternatives for the NCAA to consider without foreclosing participating by truly injured athletes and without blocking their participation in the now-commercialized labor market.

### 2.   Breach of Contract.

Similarly, Johnson is also likely to succeed on his breach of contract claim. The NCAA expressly acknowledges in its own governing documents that eligibility for membership is conditioned upon each institution's acceptance and observance of NCAA rules, regulations, and bylaws. (*See* NCAA Bylaw 20.1.1.) As a condition of membership, every "Active Member"—that is, a four-year accredited college or university with the right to compete in national championships and vote on NCAA legislation—must "administer its athletics programs in accordance with NCAA bylaws." (NCAA Bylaw 20.2.4.1; *see also* NCAA Bylaw 20.2.1.2.) Member institutions are likewise required to "[e]nsure participating student-athletes are in good standing with the...national Association." (NCAA Constitution, Art. 2, § D.1.)

21

These contractual provisions collectively establish that the NCAA's bylaws form the governing agreement between the Association, its member institutions, and their student-athletes. The express purpose of that agreement is to create an organization dedicated to the well-being and lifelong success of college athletes" that will "regulate the rules of college sport and protect young athletes. The NCAA further promises to ensure "fair and inclusive competition" through consistent application of its "rules and guidelines and providing enforcement." These commitments are not aspirational slogans—they are contractual obligations designed for the benefit of student-athletes such as Johnson, who rely on the NCAA to administer eligibility rules equitably and in good faith.

In this case, the NCAA failed to follow its own bylaws and precedents in denying Johnson's medical hardship waiver under Bylaw 12.8.4 (b) & (c). The undisputed evidence shows that Johnson's 2024–2025 season was marred by repeated, documented injuries, including a misdiagnosed wrist injury that—had it been properly treated—would have ended his season before the 30% participation threshold was reached. The NCAA's own precedent, including the *Petition of Ryan Cornish* (Case No. 1240764), confirms that medical hardship waivers have been granted in nearly identical circumstances. Yet, in deciding Johnson's appeal, the NCAA declined to consider the *Cornish* decision, asserting that it was "unpublished" and therefore not precedential. This refusal underscores the arbitrary and opaque nature of the NCAA's decision-making process, where similarly situated athletes receive disparate treatment based on undisclosed internal classifications of prior cases.

By ignoring its governing documents, established practices, and the purpose of its own hardship provisions, the NCAA acted in an arbitrary and capricious manner that directly contradicts the obligations of fairness and consistency it owes to its member institutions and student-athletes. Under well-established principles of contract law, such conduct constitutes a

22

breach of the NCAA's contractual duties and the implied covenant of good faith and fair dealing. *See Oliver v. NCAA*, 920 N.E.2d 203, 211–12 (Ohio Ct. Com. Pl. 2008) (finding NCAA liable for breach of good faith and fair dealing where it failed to fairly apply its eligibility rules).

Accordingly, Plaintiff has demonstrated a strong likelihood of success on his breach of contract claim. The NCAA's refusal to apply its own bylaws as written, to adhere to precedent, and to provide a reasoned and fair evaluation of Johnson's hardship waiver request violates the very terms of the contractual framework that governs its relationship with student-athletes. The Court should therefore find that Johnson is likely to prevail on this claim and issue a temporary restraining order restoring his eligibility pending final resolution of this action.

### 3. Tortious Interference with Contract with Ohio State.

Johnson is likely to succeed on the merits of his tortious interference with a contract claim. The elements of tortious interference with contract are "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 923 (S.D. Ohio 2017) (quoting *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 1999- Ohio 260, 707 N.E.2d 853, 858 (Ohio 1999)). First, there is no real dispute that Johnson has established business or business-like relationships with Ohio State and others. If declared eligible, Johnson will receive compensation for his NIL from Ohio State for the 2025-2026 season. (Diebler Dec. ¶ 5; Wilson Dec. at ¶ 7). This agreement constitutes a valid and binding contract under Ohio law, supported by consideration and mutual obligations between the parties.

Second, the NCAA is fully aware of the financial implications of its eligibility determinations in the post-*House* era, where college athletes are now permitted to receive direct

compensation through NIL agreements and revenue-sharing models. Following the *House* settlement, the NCAA publicly acknowledged that athlete compensation and NIL income are integral components of modern college athletics, and that eligibility decisions have immediate and foreseeable economic consequences for student-athletes. *See* Letter from Charlie Baker, President, National Collegiate Athletic Association (June 6, 2025), available at https://www.ncaa.org/news/2025/6/6/media-center-a-letter-from-ncaa-president-charlie-baker.aspx. Accordingly, even if the NCAA did not review Johnson's specific NIL agreement, it knew or should have known that declaring him ineligible would automatically void or suspend existing NIL contracts and render him unable to enter into any additional contracts, depriving him of substantial income and professional opportunities. The NCAA's awareness of this economic reality satisfies the knowledge element under Ohio law.

Third, the NCAA's intentional and arbitrary denial of Johnson's medical hardship waiver constitutes the intentional procurement of a breach. By declaring Johnson ineligible to compete, the NCAA knowingly rendered it impossible for him to satisfy the eligibility condition precedent in his NIL agreement—thereby causing the agreement's termination and preventing its performance.

Fourth, the NCAA's conduct lacks any legitimate justification. The NCAA's refusal to consider relevant precedent, including the *Cornish* decision, and its reliance on the "unpublished" status of that precedent to disregard it, demonstrate an absence of good faith and a lack of any rational basis for its decision. While the NCAA may assert a general interest in maintaining eligibility standards, that interest cannot justify an arbitrary, inconsistent, and anti-competitive application of its rules that serves no legitimate purpose and is contrary to its own bylaws and stated mission to ensure "fair and inclusive competition."

24

Finally, Johnson has suffered significant and measurable damages as a direct and proximate result of the NCAA's interference. The NCAA's actions have caused him to lose his NIL agreement, as well as the professional exposure and developmental opportunities uniquely tied to participation in the 2025–2026 basketball season. These damages are both economic and reputational in nature and cannot be remedied by monetary compensation alone, further supporting injunctive relief.

For these reasons, Johnson has demonstrated a strong likelihood of success on his tortious interference with contract claim. The NCAA's deliberate and unjustified conduct directly destroyed a valid and valuable contract, inflicting immediate and irreparable harm on Johnson. Accordingly, the Court should issue a temporary restraining order restoring his eligibility to prevent further interference and preserve the integrity of his contractual rights.

### 4. Arbitrary Enforcement of Rules, Regulations, and/or Bylaws.

Johnson is likely to succeed on his claim that the NCAA's Hardship Restriction constitutes arbitrary enforcement of its own bylaws. The Hardship Restriction operates as a rigid cap on medical hardship waivers without any connection to the NCAA's stated educational mission or its goal of promoting student-athlete welfare. By denying relief because Johnson participated in slightly more than 30% of his team's games, with two of those in the second-part of the season, the NCAA applies a numerical and timing threshold that bears no rational relationship to his actual ability to recover from injury, continue his education, or compete safely.

Such a mechanistic application of the Hardship Restriction renders the policy arbitrary and capricious. The Hardship Restriction punishes student-athletes for circumstances beyond their control—namely, injury and medical necessity—without furthering any legitimate educational or competitive objective. Johnson's claim, therefore, has a strong likelihood of prevailing.

25

**B. Irreparable harm to Johnson.**

The issues involved in this case, including the denial of eligibility and the loss of the potential to play Division I basketball, have repeatedly been found by courts to cause irreparable harm. Courts across the county had no trouble concluding that the denial of the ability to play sports constitutes irreparable harm. *See, Ohio v. NCAA*, 706 F.Supp.3d 583, 597 (2023) ("courts have repeatedly found that 'college students suffer irreparable harm when they are denied the opportunity to play sports.'"); *see also, Pavia v. NCAA, supra*; *S.A. v. Sioux Falls Sch. Dist.*, 49-5, No. 4:23-CV-04139, 2023 WL 6794207, \*9 (D.S.D. 10/13/23); *McCormick ex rel. McCormick v. Sch. Dist. Of Mamaroneck*, 370 F.3d 275, 302 n. 25 (2d Cir. 2004); and *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis.").

Johnson's situation falls squarely within that precedent. The 2025–2026 season represents his final and only opportunity to compete at the NCAA Division I level after years of injury and hardship. As a well-established student-athlete with a recognized name and performance record Johnson's NIL market value is peaking. (Wilson Dec. at ¶ 12). If he is not permitted to play, he will permanently lose his last chance to compete, to contribute to his team, and to pursue the exposure necessary to continue his athletic career beyond college. (*Id.* at ¶ 13). No amount of post-season relief can restore a lost season of competition or the unique developmental and professional opportunities it provides. As other courts have recognized, "the fleeting nature of college athletics" makes such losses inherently irreparable. *Biediger*, 616 F. Supp. 2d at 291.

The harm extends beyond athletics to tangible economic and professional consequences. If declared eligible, Johnson will receive compensation for his NIL from Ohio State for the 2025-

26

2026 season (Diebler Dec. ¶ 5; Wilson Dec. at ¶ 7). While the dollar amount of NIL compensation might theoretically be calculable, the lost opportunity for exposure, development, and personal brand growth associated with playing at a nationally televised Division I program cannot. As the court noted in *Pavia v. NCAA, supra*, at *12, the denial of the chance to play not only deprives a student-athlete of immediate economic benefits but also of the ability to build his "personal brand" and future professional value. Each missed practice and game irreversibly diminishes Johnson's visibility, reputation, and professional trajectory—harms that monetary damages cannot later repair.

In short, Johnson's exclusion from the upcoming season would destroy a once-in-a-lifetime opportunity to compete, earn, and advance his career. These are non-compensable injuries that strike at the core of why injunctive relief exists. The Court should therefore find that Johnson will suffer irreparable harm absent a temporary restraining order restoring his eligibility for the 2025–2026 season.

## C. Balance of Equities.

The balance of equities in this case overwhelmingly favors Johnson. The harm he faces if injunctive relief is denied—loss of his final year of NCAA eligibility, forfeiture of his NIL contract, and permanent damage to his athletic and professional career—is immediate, irreparable, and life-altering (Wilson Dec. at ¶¶ 9-12). In contrast, the NCAA will suffer no cognizable harm from temporarily allowing Johnson to compete while this Court determines the legality of its actions.

Courts have consistently held that when a student-athlete faces the loss of a season of competition, the equities favor the athlete. *See Ohio v. NCAA*, 706 F. Supp. 3d 583, 598 (S.D. Ohio 2023); *Pavia v. NCAA*, No. 3:34-cv-01336, 2024 U.S. Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024). Here, Johnson seeks only to preserve the status quo—the opportunity to train, compete, and

27

fulfill his contractual and educational commitments—while the Court reviews the NCAA's actions. This relief is temporary and reversible; it does not confer a final determination of eligibility but merely prevents irrevocable harm.

On the other hand, denying relief would irreversibly end Johnson's collegiate career. Once the 2025–2026 season begins, each missed game represents a lost opportunity that cannot be restored by later judicial relief. The balance of harms therefore tips sharply in Johnson's favor: his loss is personal, professional, and permanent, while the NCAA's "harm" consists only of the temporary participation of one athlete in a season of competition—a harm that courts have routinely held is *de minimis*.

Moreover, the NCAA's own conduct demonstrates that it can and does grant waivers in comparable situations without undermining competitive balance or institutional integrity. Allowing Johnson to play poses no risk to the NCAA's mission or to other teams; it merely ensures that he is treated equitably under the rules that purport to protect student-athletes. By contrast, denying the injunction would penalize a student-athlete for circumstances beyond his control— medical misdiagnosis and administrative inconsistency—and would defeat the fairness principles the NCAA claims to uphold.

In sum, the equities decisively favor Johnson. The requested relief imposes virtually no burden on the NCAA but prevents severe, irreversible harm to a young man's education, livelihood, and career. Under well-settled principles governing equitable relief, that balance mandates the issuance of a temporary restraining order restoring Johnson's eligibility pending final adjudication.

**D. Public Interest.**

Granting a temporary restraining order and preliminary injunction in this case would serve the public interest by ensuring fairness, equity, and adherence to the governing rules in collegiate athletics. The public has a substantial interest in maintaining the integrity of athletic programs, while also protecting individual rights against arbitrary or capricious administrative decisions. Here, the relief sought—temporary restoration of eligibility—serves that interest by ensuring that a student-athlete is not irreparably harmed by an overly rigid application of the medical hardship waiver rules.

Moreover, denying the requested relief risks sending a message that student-athletes have no recourse when institutional decisions fail to account for extraordinary circumstances, such as a missed medical diagnosis. Granting a TRO would allow Johnson to continue pursuing educational and athletic opportunities without undermining the broader rules of competition, as the requested relief is temporary and preserves the status quo until the Court can make a full determination.

In sum, the public interest would be served by an injunction that aligns athletic eligibility with the modern economic realities of college sports, where athletes are compensated directly by their institutions and eligibility determinations have immediate financial consequences. Temporary relief promotes fairness, prevents unnecessary disruption to Johnson's career and education, and ensures that administrative decisions are subject to judicial review when warranted.

**E. No bond necessary.**

Despite the mandate of Fed. R. Civ. P. 65(c) requiring security prior to issuing an injunction, Johnson respectfully requests that this Court not require any such security prior to issuing a temporary restraining order or preliminary injunction in this case. Should this court issue initial injunctive relief, Defendant will certainly not suffer financial burden in compliance with

such injunctive relief because the requested injunctive relief does not require any affirmative steps on the part of defendant. Rather, it would simply prevent defendant from enforcing the Eligibility Limitation Bylaws as to Johnson and enforcing the Rule of Restitution against Johnson or Ohio State. *See*, *Ohio v. NCAA*, *supra*, 706 F.Supp.3d 583, 602 ("the NCAA will not suffer financial burden in compliance with [the requested] injunctive relief"); *see also, Pavia v. NCAA, supra*, at *13. Therefore, no security should be necessary to pursue the relief requested.

## IV.    RULE OF RESTITUTION.

The NCAA's "Rule of Restitution," codified at Bylaw 12.11.4.2, is a unique provision that purports to authorize the NCAA to retroactively penalize institutions and student-athletes who rely on validly issued court orders. The rule provides that if a student-athlete competes under the protection of a temporary restraining order or injunction that is later vacated, stayed, or reversed, the NCAA may take a wide range of punitive actions against the athlete's school, including vacating individual and team records, forfeiting games, revoking awards, imposing postseason bans, and even reclaiming television revenue (Compl. ¶¶ 96-101).

In practical terms, if a court enjoins the NCAA to allow a student-athlete to play while litigation is pending—and that order is later modified or dissolved—the NCAA claims the power to punish both the athlete and the institution for having followed the court's directive (Compl. ¶¶ 96-101). The consequences are sweeping: the institution can be forced to vacate wins, return trophies, forfeit tournament eligibility, and suffer reputational harm, while uninvolved teammates are deprived of recognition and postseason opportunities.

The clear purpose and effect of the Rule of Restitution is to deter athletes and member schools from seeking judicial review of NCAA eligibility decisions. By threatening retroactive sanctions for compliance with court orders, the rule effectively nullifies the right to meaningful

30

injunctive relief and undermines the authority of the judiciary to maintain the status quo during litigation. The NCAA has used the rule as a litigation tactic—an implicit warning to schools that obeying a judicial injunction could later expose them to severe penalties. As a result, the rule chills the assertion of legitimate legal rights by athletes and institutions alike.

Recognizing the coercive and unconstitutional nature of the Rule of Restitution, multiple courts have enjoined its enforcement when granting temporary or preliminary relief to student-athletes. In *Williams v. NCAA*, No. 24-cv-614, 2024 U.S. Dist. LEXIS 18479, at \*9 (D.N.J. Feb. 2, 2024), the court held that the NCAA could not penalize a university for complying with a valid federal court injunction. Likewise, in *Pavia v. NCAA*, Case No. 3:34-cv-01336, 2024 U.S. Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024), the court expressly prohibited enforcement of the Rule of Restitution against Vanderbilt University and its quarterback after granting injunctive relief restoring his eligibility. Most recently, in *Moore v. NCAA*, Case No. DC-25-1315 (Dallas Cty. Dist. Ct. Tex. Aug. 12, 2025), Judge Dale Tillery enjoined both the NCAA's eligibility restrictions and the Rule of Restitution, recognizing that the threat of retroactive punishment would otherwise "render the Court's injunction meaningless."

For the injunctive relief sought by Johnson to be effective, this Court must likewise enjoin the NCAA from enforcing Bylaw 12.11.4.2 against Johnson, The Ohio State University, or any of his teammates during the pendency of this action (Compl. ¶ 101). Without such protection, Ohio State would face the impossible choice between complying with this Court's order and risking crippling NCAA sanctions. Enjoining enforcement of the Rule of Restitution is therefore essential to preserve the integrity of the Court's authority and to ensure that the relief granted to Johnson has practical effect.

31

## V.    CONCLUSION.

For the reasons set forth above, Johnson respectfully requests that this Court grant his request for a temporary restraining order and preliminary injunction, enjoining the NCAA from enforcing its Hardship Restriction against him denying his request for a Medical Hardship Waiver for eligibility for the 2025-2026 men's basketball season.

Respectfully submitted,

/s/ *Larry H. James*
LARRY H. JAMES (0021773) *Trial Attorney
CHRISTOPHER R. GREEN (0096845)
MARISSA R. BORSCHKE (0100369)
Amundsen Davis LLC
500 S. Front Street, Suite 1200
Columbus, Ohio 43215
Telephone: (380) 205-6211
Email:  ljames@amundsendavislaw.com
        cgreen@amundsendavislaw.com
        mborschke@amundsendavislaw.com
*Counsel for Plaintiff, Donovan "Puff" Johnson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2025, a true and correct copy of the

foregoing has been served via the Court's CM/ECF system upon all counsel of record, as well as

with the service packet served with the summons upon:

National Collegiate Athletic Association
c/o Jared Tidemann
Director of Legal Affairs and Senior Counsel of Government and Sports Administration
700 W. Washington Street
Indianapolis, IN 46206-6222
jtidemann@ncaa.org

/s/ *Larry H. James*
LARRY H. JAMES (0021773)
*Counsel for Plaintiff, Donovan "Puff" Johnson*

33