IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Donovan "Puff" Johnson | : |
| | : Case No. 2:25-cv-01288 |
| Plaintiff, | : |
| v. | : Judge Graham |
| | : |
| National Collegiate Athletic Association | : Magistrate Judge Jolson |
| | : |
| Defendant. | : |

## OPINION & ORDER

This matter is before the Court upon Plaintiff's motion for temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65. Plaintiff Donovan "Puff" Johnson ("Plaintiff"), a collegiate basketball player, seeks an order enjoining Defendant National Collegiate Athletic Association ("NCAA") from enforcing provisions (b) and (c) of NCAA Bylaw 12.8.4, because enforcement of such provisions excludes him from participation in the 2025-2026 collegiate basketball season. For the following reasons, the Court **DENIES** Plaintiff's motion.

## STANDARD OF REVIEW

In evaluating a motion for a temporary restraining order ("TRO"), or preliminary injunction, the court considers "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay."

[1]

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "All four factors are not prerequisites but are interconnected considerations that must be balanced together." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) (citing *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir. 1991)).

"The party seeking the preliminary injunction bears the burden of justifying such relief," including showing likelihood of success and irreparable harm. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

## BACKGROUND

<u>Plaintiff's Bid for an Additional Year of Eligibility</u>

According to the facts set forth in his verified complaint, Plaintiff is currently enrolled at The Ohio State University ("OSU"). Doc. 1, PAGEID # 8. In his first season of collegiate basketball (2020-2021), Plaintiff attended the University of North Carolina at Chapel Hill ("UNC"), a Division I basketball school, on a full athletic scholarship. *Id.* at # 12. However, a broken foot limited Plaintiff to fewer than 60 minutes of game action. *Id.* His second season (2021-2022), still at UNC, Plaintiff returned from injury and contributed to UNC's success in the NCAA tournament. *Id.* at # 13. In his third season (2022-2023), Plaintiff again suffered injury issues, missing "preseason, training camp, and the first three games," while recurring issues "forced him to miss several additional games." *Id.* In his fourth season (2023-2024), Plaintiff

[2]

transferred to Pennsylvania State University ("Penn State") "to continue his academic and athletic career," but again found his season disrupted by injuries, this time missing "the entire preseason[,] the first two games of the season," and "additional games." *Id.* In his fifth and most recent season (2024-2025), still at Penn State, Plaintiff sustained "(1) a heel stress fracture; (2) a right wrist injury; (3) a concussion; and (4) a broken right hand requiring season-ending surgery." *Id.*

Under the NCAA's "Four Seasons Rule" (Bylaw 12.6.1; *see* doc. 13-2, # 229),[1] a collegiate athlete is typically limited to only four seasons of intercollegiate play. *Id.* However, due to disruptions caused by the COVID-19 pandemic, the entire 2020-2021 season is disregarded for all NCAA athletes for eligibility purposes. *Id.* at # 13, n.2. Thus, Plaintiff's first season did not count toward his limit under the Four Seasons Rule. But four seasons later, having taken the court in five different seasons overall, Plaintiff's eligibility ran out. *Id.* at # 14.

In a bid for "a final opportunity at a healthy, injury-free season," Plaintiff enrolled at OSU and applied (together with OSU) for a medical hardship waiver to restore his eligibility for the upcoming season. *Id.* Under NCAA Bylaw 12.6.4, "A student athlete may be granted an additional year of competition by the conference or the Athletics Eligibility Subcomittee for reasons of 'hardship.'" NCAA Bylaw 12.6.4 (doc. 13-2, # 236). Under the Bylaw's definition of "hardship," a player who participates in more than 30% of the maximum number of qualifying contests, or who

---

[1] The Court refers to the NCAA Division I 2024-2025 Manual, a copy of which Defendant attached to its responsive briefing. Doc. 13-2.

[3]

participates in *any* contest in the second half of the season does not qualify for a hardship waiver.

Plaintiff sought a waiver as to his most recent season,[2] the 2024-2025 men's basketball season in which he participated in 55% of the maximum number of contests for Penn State. Being more than half of the overall games, this of course included contests in the second half of the season. Rather predictably, Plaintiff's waiver application was denied.[3] Plaintiff and Ohio State appealed that decision, with the appeal currently pending, though the NCAA has stated that it will be denying the appeal. *See* Doc, 13, # 131.

Meanwhile, Plaintiff has filed the instant suit, seeking an order from this Court enjoining the NCAA from "enforcing its Hardship Restriction against him" and enjoining the denial of "his request for a Medical Hardship Waiver for eligibility for the 2025-2026 men's basketball season." Doc. 4, # 93. Practically speaking, Plaintiff appears to seek exemption from the Four Seasons Rule; merely preventing the NCAA from "enforcing" its denial of his waiver would not restore his exhausted eligibility. Plaintiff thus seeks an order affirmatively declaring him to be eligible to compete in

---

[2] Though it appears that Plaintiff's participation was most limited in his freshman season, the COVID-19 blanket waiver rendered that season a nullity. Or, to put it another way, he already enjoyed and exercised a waiver for his first/freshman season when he participated (however limited) in his fifth season last year. *See* NCAA Bylaw 12.6.3.1; doc. 13-2, # 232. ("Any competition, regardless of time, during a season in an intercollegiate sport shall be counted as a season of competition in that sport[.]").

[3] In fairness, Plaintiff's argument for a waiver is slightly more nuanced—he argues that his participation above the waiver threshold can be attributed to the early misdiagnosis of what should have been found to be a season-ending injury—but his argument before this Court concerns the allegedly anticompetitive restraints on hardship eligibility, such that the denial of his waiver was wrongful regardless of any misdiagnosis.

[4]

the current Division I men's basketball 2025-2026 season (which started in early November 2025) and allowing him to participate for OSU's men's basketball team for the remainder of the season. Doc. 1, # 33. According to Plaintiff, he will receive a spot on the roster and a scholarship at OSU if he is eligible to play. Doc. 4-1, # 95. He believes that he will also receive a share of name, image, and likeness ("NIL") monetary compensation should he play.

Shifting Landscape of Collegiate Athletics

Plaintiff's challenge comes amid tectonic shifts in the landscape of collegiate athletics. In 2021, the Supreme Court decided *NCAA v. Alston*, which affirmed a district court's injunction against NCAA's restrictions on education-related benefits. 594 U.S. 69, 84 (2021). Though relatively limited in scope, *Alston* begat a sea change in collegiate athletics. Most relevant here, Justice Kavanaugh, in his concurrence, wrote that *Alston* establishes that "the NCAA's remaining compensation rules should receive ordinary 'rule of reason' scrutiny under antitrust laws." *Id.* at 108 (Kavanaugh, J., concurring).

Though *Alston* was decided only four years ago, its distinction between "education-related benefits" and other compensation rules is largely obsolete: "NCAA eligibility is now directly tied to economic opportunity: the ability to earn NIL income, secure sponsorships, and pursue professional advancement." Doc. 4, # 64. Given the (allegedly) substantial monetary stakes, Plaintiff is far from alone in his desire to continue playing beyond limits set forth by the NCAA. *See, e.g., Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), *appeal dismissed as*

[5]

*moot,* 154 F.4th 407 (6th Cir. 2025); *Zeigler v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-CV-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. June 12, 2025); *Robinson v. Nat'l Collegiate Athletic Ass'n*, No. 1:25-CV-75, 2025 WL 2409203 (N.D.W. Va. Aug. 20, 2025); *Hasz v. Nat'l Collegiate Athletic Ass'n*, No. 8:25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025); *Braham v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-CV-00253-MMD-CSD, 2025 WL 2017162 (D. Nev. July 18, 2025); *Coley v. Nat'l Collegiate Athletic Ass'n*, No. 5:25-CV-98-D, 2025 WL 1616719 (E.D.N.C. June 6, 2025).

## ANALYSIS

Plaintiff's challenge, like those above, takes its cue from *Alston* by challenging the rules at issue under the Sherman Act, 15 U.S.C. § 1.[4] Doc. 4, # 74. The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court has long recognized that "restraint of trade" is "best read to mean" "undue" or "unreasonable" restraint. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018).

To determine whether a given restraint is undue or unreasonable, courts conduct a "rule of reason analysis." *Alston*, 594 U.S. at 81 (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). A rule of reason analysis requires "a fact-specific assessment of 'market power and market structure'" to assess a given restraint's "actual effect" on competition. *Am. Express Co.*, 585 U.S. at 541 (quoting *Copperweld*

---

[4] Plaintiff also brings the challenge under Ohio's Valentine Act, which is patterned after federal antitrust law, and thus does not require separate analysis. *See Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 8, 106 Ohio St. 3d 278, 281, 834 N.E.2d 791, 795.

*Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). Functionally, the rule of reason analysis follows a three-step, burden-shifting framework. *Id.* First, the plaintiff must show "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* Upon a successful showing, the burden then shifts to the defendant "to show procompetitive rationale for the restraint." *Id.* If the defendant meets its burden, the third step requires the plaintiff to show "that the procompetitive efficiencies could be reasonable achieved through less competitive means." *Id.* at 542.

I. **Plaintiff has Failed to Show a Likelihood of Success on the Merits of his Sherman Act Claim.**

A. **The Challenged Restriction is Commercial in Nature and thus Subject to Rule of Reason Analysis.**

Plaintiff argues that the "Hardship Restriction" is a commercial restraint, and thus subject to the Sherman Act, citing *Zeigler v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-CV-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. June 12, 2025). In *Ziegler*, the plaintiff brought a Sherman Act challenge to the Four Seasons Rule, which the court found to be commercial "because it implicates 'commercial activity'… and has 'some commercial impact.'" *Id.* at *3 (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 433 (6th Cir. 2008) and *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.*, 388 F.3d 955, 959 (6th Cir. 2004)). The court observed that, following *Alston*, "Division I basketball players may receive compensation in exchange for their athletic services." *Id.* Thus, the Four Seasons Rule, which limits the players' participation opportunities, "has some commercial impact." *Id. But see Hasz v. Nat'l Collegiate Athletic Ass'n*, No. 8:25CV398, 2025 WL 2083853, at *4 (D.

Neb. July 24, 2025) (finding Four Seasons Rule has only incidental effect on player compensation and thus is "a pure eligibility rule rather than a commercial rule," and thus not subject to Sherman Act).

Plaintiff argues that the same logic applies to the "Hardship Restriction," bringing it within the ambit of the Sherman Act. The Court agrees that the challenged restraint is commercial such that the Sherman Act applies. Whether viewing the Four Seasons Rule generally or the Hardship Waiver as an exception to the rule, the ultimate effect is that the bylaws at issue determine whether a student athlete is eligible to participate in Division I men's basketball and the opportunities for compensation that go with it. The Court finds the bylaws implicate commercial activity. *See Pavia*, 760 F. Supp. 3d at 537 (holding that "the NCAA's eligibility rules are subject to the Sherman Act.").

### B. Plaintiff Fails to Carry His Burden Under the Rule of Reason Analysis.

Plaintiff argues that, following *Alston*, "any restraints by Defendant on student-athlete eligibility harms competition." Doc. 4, # 77. Plaintiff claims that the Hardship Restriction, specifically, "systematically and arbitrarily removes valuable and productive participants from the market." *Id.* Plaintiff identifies the relevant market as "the market for NCAA athlete services." *Id.* But Plaintiff can only articulate harms which are particular to himself, and he does not identify how the restriction harms market competition. *See Hasz*, 2025 WL 2083853 at *5 (holding plaintiff has "not alleged or demonstrated any form of antitrust injury" where "only evidence is of harm to himself."). The restraint would appear—on this preliminary

[8]

view—to have a near-net-zero effect at a market level: with finite roster spots, granting Plaintiff's extraordinary remedy would have the necessary effect of excluding another eligible player. *See Ziegler*, 2025 WL 1671952 at *4 ("Plaintiff has not shown that Defendant's limit on the labor side of the market—replacing one Division I basketball player with another—produces substantial anticompetitive effects.")

Plaintiff argues that "an athlete who is allowed another season could earn additional NIL compensation, which may be life changing for student athletes." Doc. 4, # 77. Though phrased in generic terms, Plaintiff's argument does not point to market-level anticompetitive harms. Furthermore, while relief "could" earn Plaintiff additional NIL compensation, and "may be" life changing, Plaintiff's phrasing underscores the reality that the anticipated NIL compensation would not come from this Defendant but rather from third parties. *See* doc. 4-2. Plaintiff describes, at best, "secondary anticompetitive effects…brought on by independent actors in the market." *Ziegler*, 2025 WL 1671952 at *4. Therefore, because Plaintiff fails to establish his burden at the first step of the rule of reason analysis, he has not demonstrated a likelihood of success on the merits warranting injunctive relief.

Even if Plaintiff's showing were sufficient to establish substantial anticompetitive effects in the relevant market, his argument would fail at this third step of the rule of reason analysis. At the second step, the NCAA must show "procompetitive justifications" for the challenged restraint. *See Pavia*, 760 F. Supp. 3d at 541. Here, the NCAA argues that eligibility rules, such as the challenged

restraint "are procompetitive because they preserve college athletics as a unique offering from professional sports." Doc. 13, # 142. Plaintiff disputes any legitimate procompetitive justifications, arguing that the challenged restraint "simply removes one injured[5] athlete from competition, which does not improve competitive balance." Doc. 4, # 80.

At the third step of the rule of reason analysis, Plaintiff must "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Am. Express Co.*, 585 U.S. at 542. To that end, Plaintiff argues that the Hardship Restriction is "far broader than necessary to achieve any purported goal of competitive balance or fairness." Doc. 4, # 81. As an alternative, Plaintiff proposes that "the NCAA could introduce a more flexible participation cap, allowing athletes to appear in a greater percentage of games—such as up to 50%—or assess eligibility based on the actual minutes played." *Id.*

Plaintiff does not explain how such less restrictive alternatives preserve any "procompetitive efficiencies." *Am. Express Co.*, 585 U.S. at 542. Similarly, Plaintiff does not explain how his proposed alternatives are any less "arbitrary" than the current hardship waiver qualifications. Most strikingly, under Plaintiff's proposed alternatives, he would *still be denied a hardship waiver*, because his amount of

---

[5] Plaintiff repeatedly attempts to characterize his present ineligibility as a result of his injury. *See* doc. 4, # 77 ("The Hardship Restriction… removes valuable and productive participants from the market, after an injury, *in punitive fashion*."). But Plaintiff's present ineligibility has nothing to do with his injury; rather, he is ineligible because he has participated in qualifying contests every year for five (5) years, exhausting his eligibility provided under the Four Seasons Rule and the blanket COVID-19 waiver. *See* NCAA Bylaw 12.6.1.

participation last season (55% of games, >30% of the overall minutes) exceeded his proposed alternative threshold.

Sitting in consideration of an antitrust claim, courts "must give wide berth to business judgments." *Alston*, 594 U.S. at 102. Judges, "mindful… of their limitations," must "resist the temptation to require that enterprises employ the *least restrictive* means of achieving their legitimate business objectives." *Id.* at 106 (emphasis supplied). Against those currents, the Court declines Plaintiff's "invitations to 'set sail on a sea of doubt.'" *Alston*, 594 U.S. at 107 (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898) (Taft, J.)).

### C. Plaintiff's Arguments as to the Administration of the Hardship Waiver are Unavailing.

Plaintiff raises various arguments regarding Defendant's allegedly arbitrary disposition of hardship waiver requests. *See, e.g.*, doc. 2, # 65 (alleging Defendant "den[ied] [Plaintiff] relief while ignoring precedent"); and *id.* (alleging hardship criteria "is applied mechanistically… demonstrating arbitrary and capricious enforcement of NCAA rules.").

To qualify for the hardship waiver under NCAA Bylaws, the student-athlete must show "all of the following conditions":

> (a) The incapacitating injury or illness occurs in one of the four seasons of intercollegiate competition at any two-year or four-year collegiate institutions or occurs after the first day of classes in the student-athlete's senior year in high school;
> (b) The injury or illness occurs before the first contest or date of competition of the second half of the playing season that concludes with the NCAA championship in that sport

> and results in incapacity to compete for the remainder of that playing season; and
>
> (c) The injury or illness occurs when the student-athlete has not participated in more than three contests or dates of competition or 30 percent of the maximum number of contests or dates of competition of the playing season that concludes with the NCAA championship as set forth in Bylaw 17 for the applicable sport plus one contest or date of competition, whichever is greater.

(Bylaw 12.6.4; doc. 13-2, # 236). The Bylaws set out further guidelines for the administration of the hardship waiver (*See, e.g., id.* ("12.6.4.2 Criteria for Administration of Hardship Waiver"; "12.6.4.2.2 Medical Documentation"; "12.6.4.2.3 First Half and 30 Percent of Season Denominator,"; "12.6.4.2.6 Reinjury in Second Half of Season").

There is no dispute that Plaintiff does not qualify for a hardship waiver under the NCAA Bylaws. As Defendant points out, the Bylaws "represent the considered judgment of hundreds of educational institutions." Doc. 13, # 128. Defendant further notes that the Bylaws provide additional paths to waive eligibility limitations based on the Four Seasons Rule, including for players who, like Plaintiff, exceeded the 30% participation threshold, but may nevertheless qualify due to "extraordinary circumstances." *Id.* at # 144 (quoting doc. 13-2, # 639); *see also* doc. 13-2, # 229-30 ("12.6.1.3 Academic Study Abroad Exception… 12.6.1.4 Internship or Cooperative Work Experience Program Exception… 12.6.1.5 Athletics Activity Waiver… 12.6.1.7 [catch-all waiver].").

Plaintiff argues that Defendant's grant of a hardship waiver to another athlete under similar circumstances demonstrates that the denial of Plaintiff's waiver was

arbitrary. According to materials attached to Defendant's responsive briefing, in NCAA Case No. 1240764, student-athlete Ryan Cornish was granted a hardship waiver despite having "competed in five [men's basketball] contests beyond the 30-percent legislative limit," allegedly due to a misdiagnosed injury. Doc. 13-2, # 612. In essence, it appears the NCAA found that Cornish's evidence persuasively established extraordinary circumstances warranting a waiver, whereas the NCAA found that Plaintiff's evidence did not persuade. Comparing the decisions does not suggest that Defendant was arbitrary; rather, such a comparison only confirms the impropriety of intervention by this Court. The differences[6] between Plaintiff's and Cornish's cases are best considered—as they were—by Defendant, and not by this Court. Defendant notes that Plaintiff *twice* applied for a hardship waiver for the relevant season (once while still at Penn State, once after having transferred to OSU), and received further review of his request when he exercised his right to appeal each denial. *See* doc. 13-2, # 236 ("12.6.4.1.1 Review of Denied Waiver."). Still unsuccessful, Plaintiff now seeks to cast this Court as a "*de facto* appeals body for eligibility determinations." *Pavia v. Nat'l Collegiate Athletic Ass'n*, 154 F.4th 407, 418 (6th Cir. 2025) (Thapar, J., concurring). The Court declines the invitation.

In sum, Plaintiff has failed to establish a likelihood of success on the merits for his Sherman Act claim.

---

[6] For example, the decision in Plaintiff's case notes that "[c]ontemporaneous documentation specific to [Plaintiff's] December 10, 2024 injury was limited to December 15, 2024, athletic room training record for general treatment of right wrist (ice bag)." Doc. 13-2, # 609. The decision in Cornish's case noted that "[t]he outcome likely would have been different if not for the confluence of all presented factors," demonstrated by "contemporaneous medical documentation and [a] noncontemporaneous letter from treating physician." Doc. 13-2, # 612.

## II. Injunctive Relief is not Warranted Based on Remaining Factors.

As noted above, "[a]lthough no one factor is controlling," in determining whether to grant injunctive relief, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). And in this case, Plaintiff's arguments as to the remaining factors do not save his motion.

Plaintiff argues that "the loss of the potential to play Division I basketball [has] repeatedly been found by courts to cause irreparable harm." Doc. 4, # 87. Plaintiff primarily identifies the harms as both the "immediate economic benefits" (i.e., "the dollar amount of NIL compensation") as well as purportedly non-economic benefits, such as "the lost opportunity for exposure, development, and personal brand growth associated with playing at a nationally televised Division I program," as well as his "visibility, reputation, and professional trajectory." *Id.* at # 88. But, to the extent that his harm *can* be quantified in dollars and cents, it is not "irreparable" such that injunctive relief is warranted during the pendency of this case. And the other harms described are not so much "irreparable" as they are speculative. More importantly, whatever speculative harms Plaintiff can imagine from losing the opportunity to play for OSU can be just as easily imputed to an eligible player who would be deprived the same opportunity if the Court were to grant Plaintiff's request for extraordinary relief. *See Ziegler*, 2025 WL 1671952, at *5 ("[G]iven the fixed number of roster spots available for each Division I basketball team, an injunction would run the risk of harming (1) currently-enrolled Division I basketball players who have already

committed to a member institution and (2) current high school seniors who might have their college recruitment disrupted.").

Plaintiff argues that the balance of the equities "overwhelmingly" favors his position. Doc. 4, # 88. He claims that he "seeks only to preserve the status quo," whereas "denying relief would irreversibly end [Plaintiff's] collegiate career." *Id.* at # 88-89. But, again, the status quo here is one in which Plaintiff—having played qualifying contests in collegiate basketball in five separate seasons—is ineligible. Regardless, given Plaintiff's failure to demonstrate a likelihood of success on the merits, this factor would not carry the day.

Finally, the Court is not persuaded that "the public interest would be served by an injunction that aligns athletic eligibility with the modern economic realities of college sports." Doc. 4, # 90.

### III. Injunctive Relief is not Warranted for Plaintiff's Other Claims.

In his Complaint, in addition to his claims under the Sherman Act (Count I) and Ohio's equivalent (Count II), Plaintiff also alleges claims for Breach of Contract (Count III), Tortious Interference with Contract (Count IV), Arbitrary Enforcement of Rules, Regulations, and or Bylaws (Count V), and Declaratory Judgment (Count VI). Doc. 1.

As to his contract claims (Counts III & IV), such claims suffer many of the flaws discussed above. Regardless, such claims can be adequately redressed with an award of monetary damages, such that injunctive relief is not warranted. Plaintiff cites no legal support for his claim under Count V, "Arbitrary Enforcement of Rules,

Regulations, and Bylaws." *Id.*; *see also supra,* § I.C. Finally, Count VI is not referenced in Plaintiff's motion for injunctive relief. In sum, Plaintiff has not stated colorable grounds for injunctive relief as to any claim in his Complaint.

## CONCLUSION

For the reasons set forth above, the Court finds that the injunctive relief sought is not warranted. Plaintiff has not shown a substantial likelihood of success on the merits—i.e., that the Defendant's denial of his hardship waiver violated the Sherman Act. Neither has Plaintiff shown colorable grounds for preliminary relief for any of his other claims. Therefore, Plaintiff's motion is **DENIED**.

**IT IS SO ORDERED**.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: November 11, 2025